J.S.U.S. v. Barson and Juarez, and we hear first from Mr. Riding. Thank you, Your Honor. My name is James Riding and I represent Dennis Barson. I'd like to set out a few facts to set up the argument. First, Dennis Barson was a Navy doctor. After medical training, he was put in charge of medical care on an aircraft carrier, the USS Theodore Roosevelt. After finishing his duties at sea, he was put in charge of an 80-bed inpatient hospital. During this entire time, Dr. Barson simply treated patients. He did not handle billing. He did not bill Medicare. He didn't bill private insurers. After he completed his active duty, he briefly went into private practice, and again, as a contract attorney, he did not bill Medicare. He did not apply for Medicare privileges or provider numbers. After nine months in private practice, Dr. Barson moved to Austin, Texas, in order to complete a residency training in neurology. So he was at the beginning of his medical career, and it was a promising one. However, in 2009, his wife, who he had left back in Norfolk, Virginia, along with her two children, filed for divorce. And he found himself supporting himself, his wife's household, and also supporting his divorce lawyers on a residency salary of $3,800. It was under these circumstances, $3,800 a month, it was under these circumstances that Dr. Barson answered an advertisement and agreed to take a medical director's position at a clinic that was about to open in Houston, Texas. How old was he at the time? How old was he? I don't know exactly what his age was at the time. I do know that he started Doctor of Osteopathy School in 1998. So I believe by the time that he got out of school and got through with his training, he was in his 30s, maybe mid-30s, but I don't know his exact age. He signed a lot of blank forms. I mean, it seems like he would have known better than to do that. He did sign forms, and that's perfectly correct. But he had never applied for Medicare before, and that's just one of the facts of the case. He did sign blank forms. Opened a bank account. That's correct. For the bank statements to go to the clinic, which he apparently didn't want to see. Well, I don't know if he didn't want to see them or not, but the arrangement was for the bank statements to go to the business. These were business documents, and it's not unusual for business documents to go to the business address. Well, don't most people think that when you open an account in your own name, you're going to end up with some liability, some responsibility? I mean, my understanding is that practically all doctors have to go to business courses nowadays, and this fellow Dinushi or whatever he was portraying himself as says, well, we're opening this clinic, but hey, we need you. And he's not even on call, responsible for the patients. Right, he agreed to a very limited engagement because he had to fulfill 60 hours of residency work in Austin, Texas. What I mean, limited engagement but never touching a patient or seeing a patient eye-to-eye, that sounds almost too good to be true, as somebody said during the trial. Well, that is correct that he did not see the patients. It's one of the reasons why it was so difficult for the government to prove that he was deliberately ignorant of Medicare fraud. He was not at the clinic. That was not part of his duties. Was he just there on Saturday? He flew in on the weekend twice bimonthly or drove in on the weekend bimonthly for $7,000 in expenses. Was he just there on Saturday? Pardon me? Did he say yes? Yes, it was on the weekends. All right. It was on the weekends that he was there to review files. Did they bring that van down there with their patients on Saturday? No, they did not, Your Honor. The office was empty. Then on the day he came down to look at the forms. That's correct. That is correct. I would like to turn to Claims 4 and 5, which have to deal with the charge and the indictment in this case because I believe this is clearly reversible error. The barson asked for the court to give an instruction that the jury must find the object of the conspiracy that was specified by the grand jury. The court denied that. In fact, in closing argument, the government also argued that the government did not have to prove the object of the conspiracy specified by the grand jury. On appeal, the government takes the same position, that they did not have to prove the object of the conspiracy that the grand jury specifically identified. This flies in the face of this court's well-settled jurisprudence. It flies in the face of such basic cases as In re Winship, such basic cases as Francis v. Franklin, and Sterone v. United States. The judge charged that the jury had to find that the object of the conspiracy was Medicare fraud. Isn't that what the judge charged? The judge recited the statute. Did he charge that they had to find that the object of the conspiracy was Medicare fraud? That is correct. But what the judge did not do, and what the indictment clearly required the judge to do, was to instruct on the object that the grand jury has identified. That is basic Fifth Amendment law. What are those objects that you're talking about? The object of the conspiracy that was identified by the grand jury was actually quite broad. It counts as core of criminality or a theory of the case, and it went generally as follows. That Barson and others, known and unknown to the grand jury, did knowingly make false and misleading representations to Medicare that certain services were being performed when they were not being performed. That is the conspiratorial objective. It is a classical theory of the crime that must be proved beyond a reasonable doubt. It is an essential fact, an essential element, and this court's case law makes that clear. That's not an element of the offense, is it? I mean the element of the offense was Medicare fraud. Those are the elements in the statute, but the grand jury identified elemental facts or essential facts of the crime. Well, let me just, I mean I'm looking at object of the conspiracy, which is paragraph 8 of the superseding indictment, but the charge says the defendants are charged with conspiring to execute an attempt, you know, shortening this scheme and artifice to defraud Medicare, right? So do you have to prove every predicate fact that's stated in this, in an indictment in addition to the charging language? I mean to me this is not Styrone. I think it's clearly Styrone because the object of the conspiracy that was identified isn't sort of superfluous names or a mistaken date. This is the core of criminality. Did the government introduce any of the files that Barson approved or signed his name to, or did he have to sign his name to every one of them, or what? This brings us to another area of the case, which is prosecutorial misconduct. The government did not introduce the files. What happened instead was that the files went missing, and the government, in closing argument, tried to attribute the disappearance of the files to Dennis Barson. They also put on a case agent to try to set up, closing argument, attributing the missing files to Dennis Barson. This was critically important because it helped establish the government's deliberate ignorance. But Barson was not involved in the disappearance of the files, and the government knew it, and we've shown it in our brief. He didn't testify at trial. Barson did testify. He did testify. Okay, well, I guess what I'm getting at is that everybody who came in there had an EKG, and nearly all of them were shown as receiving these anal and rectal function procedures. And at my age, I've heard about various things like this, but I've never heard of these precise procedures. And what I'm wondering is, what is the level of evidence that Barson knew that these are, A, unusual procedures and that every single person who supposedly visited that clinic was getting them? There was no evidence that Barson knew who the biller was, knew that these tests were being billed, or knew that these services were the ones that were being coded for. In fact, he was under the impression that only EKGs, non-invasive tests, EKGs, spirometry, and some ultrasound were being performed at that clinic. And the government doesn't maintain and didn't argue at trial that those procedures were fraudulently billed. He was under the impression that was what was going on at the clinic. The billing was being done remotely from Glendale, California, and it's important for this court to... He would come on Saturday. Did he see that there was not an instrumentality that would perform those procedures? Did he see, what, empty rooms? No, he did not see empty rooms. What he saw was... He just came into the office. Well, he did not see empty rooms. He came into the office. He sat down in the office, and he looked at some papers, and he was paid, well, $10,000. The agreement was for $7,000 a month for him to come to Houston bi-monthly. If you think of expert witness fees, that's a couple days out of your month, and it clearly would amount up to something like $7,000. That was the bargain that he struck. There's nothing outrageous about that. The Medicare charge went out over his signature, is that right, from the clinic? No, that's not correct because the charge don't go to Medicare. The charts do not go to Medicare. Charges, bills. The bills did not went out over his NPI but not over his signature. The clinic used Barson's NPI to bill for services. What does that mean? You mean he signed the form? His national provider identification number. Say again? His national provider identification number is what the NPI is. Let me ask you quickly about the victims. What practical difference does that make in the sentence exposure, the definition of victims? That's one of your issues. Yes, that was one of my issues. I maintain that victims is defined too broadly, that what we have was not a modification of the statute identifying. Well, I understand that, but I'm saying, did it make any practical difference in the sentencing level? I believe that it did, Your Honor, but I cannot say exactly what that difference was right now. Okay. Well, back on this other business, though. So your client says that all he was doing was, what was he doing? Reading spirometry and EKG printouts? Yes, he was reading those tests which were in the files. And this is another critical point. It was established through the government's own witness, the medical assistants who was administering these tests, that these tests were in the files. So he had actual aged patient files with histories and with the results of these tests that he was looking at. So it looked to him that was what was being done at the clinic. But behind the scenes out at Glendale, and it was Barson's defense attorneys that introduced this evidence, a man named Generic Abramian, who was a co-conspirator mentioned in the indictment, was doing the billing and billing these fraudulent, strange tests, unknown to Barson. But he was the only doctor on the scene, is that right? He was the only doctor on the scene. Doesn't Medicare require a doctor's signature before they pay a bill somewhere? No, it does not. The signatures aren't sent into the... The billing is done electronically. You do have to sign off on paperwork to get a provider number. But they're not getting from the clinic signed progress notes or anything like that. They're just getting an electronic bill. And that was being done. That's why it could be done remotely and without Barson's knowledge. What kind of ultrasounds did he sign off on? Well, he wasn't signing off on ultrasounds. Part of the agreement was that he wasn't going to read them because he was specialized in neurology and internal medicine and not in radiology. They had a doctor, according to the manager of the clinic who set it up in California, who was reading the ultrasound. And one of the reasons that Barson shut the clinic down after six weeks only, he shut it down, was because he could never get that radiologist on the phone. He signed some checks out of the bank after that. Yes, he did. He wound up the business after that. That's all that he did. But the important part is that he shut it down. And this is another area of prosecutorial misconduct because the government claimed that he shut it down because he got warning calls from Health Integrity, and that was completely false. Well, after things were suspicious, did he notify the law authorities? No, he did not notify Medicare. He did not notify the law authorities. No, he did not. But the important point is that after he was suspicious, he didn't continue the fraud. He suspected there may have been some fraud, is what he told the investigator three years after the fact, and then he shut down the clinic. In your cases where you have found deliberate ignorance of a conspiracy, for example, in the drug cases, it's where the driver keeps going after he's suspicious and doesn't leave the scene. If that had happened, there would be no agreement. Here, as soon as he became suspicious, he shut down the clinic. How often did he see Shakhbazian? He only saw Shakhbazian on a couple of occasions. In fact, Shakhbazian was out of the country for a portion of the time. So attempting to find an agreement with Shakhbazian is extraordinarily difficult. All he can go to is the founding of the clinic. Counsel, I don't understand what this doctor in California was supposed to do. Some of these procedures are pretty complicated, and he doesn't see anybody that knows how to treat a little scratch. The only people that he did try to call were out in California. Who was doing all of this medical work, the papers he was signing? The medical work was very limited. It was basic screening tests. That's what was being done at the clinic. There's no dispute that the rectal sensitivity tests and the electromyography, which was a test of the musculature of the urethra and anus, were not being performed. But Dr. Barson had no idea that they were being billed. In his training, he had never heard of these procedures. They are, in fact, malpractice. He just doesn't do it on anything except on a fairly narrow range of people. Who did he think was performing these tests? He didn't think anyone was performing these tests because these tests were being billed remotely from California without anybody's knowledge. He didn't know anything about what he was signing. He was just signing. Well, what he thought he was signing off, and what he thought he was checking, were basic screening tests that the clinic was set up to provide, the EKGs, the spirometry, and some of the ultrasound, and histories of patients. That's what he saw. The clinic was up front. One of our claims also, and this is important to know, is that we tried to get in the plea of Shagpazian, and our request was denied. We made constitutional. We'll cover that in your brief. You've got a red light, sir. Oh, yes, Your Honor. You have some time left for rebuttal. Thank you, Your Honor. Okay, Mr. Yannis. Good morning, and may it please the Court. I'm Mark Yannis for Mr. Juarez. I think that Mr. Juarez's case is relatively simple, and I just wanted to emphasize a couple of points on the sufficiency issue. The Gulf Freeway Clinic was a self-contained and staffed operating clinic where many patients were seen, dozens or possibly in the hundreds, and where many tests were performed on them, and the clinic had no connection to the billing, and this was Mr. Juarez's day job. What do you mean? Who was paying off the people who were bused into the clinic? I don't know. I know that there was testimony that they got payments from some guy, but I don't know that Mr. Juarez had anything. There's no evidence that Mr. Juarez had anything? No, there's nothing in the record, and it's pretty shady about how they were paid to come there. But there's nothing in the record that would connect him to that. But as far as Mr. Juarez, this was his day job. He saw most or all of the patients. Impersonating a physician's assistant was his day job. Yeah, that's true. That's what makes you cringe because it's like he's a bad guy. He did something bad, and there's some suspicious circumstances. The problem is that you can certainly nail him for unauthorized practice of medicine, and it looks like he'd done that before, and it looks like he was doing that as an end in itself. We have some bad facts there, but the bottom line is that these cases, the cases that I discussed at some length in our briefing state that they show a range of all these people who've done bad things. They've concealed bad actions. They've lied to the government. They are investigators, and they've lied about material issues going directly to the fraud, even. Like the father in that, I think it's called the Rasperian case, he lied about the finances of the company, and that was what the fraud was about. Here, Mr. Juarez was less than candid with the investigators, but it was several years after the fact, and he was already on notice that he was in trouble, and he was also aware that he had done something wrong in practicing medicine. But the most important thing here is that these cases hold that no matter how bad that looks, the government has a really high burden in these conspiracy cases to show some knowledge of the fraud. Again, this was in a place where there was no reason to believe that this clinic was where it all began and ended, and only in hindsight can we look at this and say, oh, there was a fraudulent billing operation 1,500 miles away in some guy's one-bedroom apartment in California. He manned the clinic, is that right? Well, he was Dr. Dario, so I guess he was known as the physician for the clinic. There were several other staffers. Was he ordinarily the only person there? No, there was Amber Wheeler, George. He had some testing function. So you had these hordes of people coming in. A lot of people coming in. They came together in a van. Pardon? They came together in a van. They came in vans, but you know. And lined up and come sit for a medical procedure by a doctor. But I don't know that that's. . . And he just didn't know what they were doing. It must be proper medical treatment. Well, I don't know that that's that uncommon for elderly patients, low-income patients to come and to be taken all at once who don't have transportation, to be taken to medical clinics or to be taken to other things. So I don't think that was necessarily out of the ordinary. But it doesn't add up to where he knew there was a fraudulent billing operation. And that's where we have a huge gulf here. Yeah, the guy looks bad for practicing medicine without a license, but there's absolutely nothing there to connect him with the fraudulent billing. He looks bad because the fire started and all the files disappeared. Well, the files, as I point out in a brief, all the evidence in the record shows that those files would have been exculpatory because they showed only the tests that were performed. And so if anything, if the files were recovered, it would have shown that the only thing that he was doing and the only thing he knew of were the tests that were actually being performed. And that obviously can't be part of this fraudulent billing. But he saw Mr. Shakbazian pretty frequently, didn't he? He saw him there. But that's another thing is Mr. Shakbazian didn't even tell him his real name. It appears that he was using Mr. Juarez basically as a dupe. And he wasn't part of the inner circle of these guys who were doing the Medicaid fraud. So I don't think that that's relevant, or it's marginally relevant is what I would say, but it still doesn't allow us to make this huge inferential leap that he knew of the fraudulent billing. And, again, I think that that's one of these things we make in hindsight. We have to be careful about that. It's like, oh, of course there is something else going on. But I think at a time when you have a guy who's going to work every day and doing his job, and he may not have been doing it legitimately, it just doesn't show that he knows of a fraudulent billing operation, especially when he's working really hard and doing testing. Who was maintaining? I mean, so there was no billing or any administrative work being done out of that clinic. So who was filling out the time and attendance records for the Fair Labor Standards Act? I think you've got me stumped there. Unfortunately, I don't remember. I'm sorry, I don't remember that being in the record. And I don't know that that – I don't even know if that would be – withholding taxes, I mean, you know. But I don't know why he would need to concern himself with that. He was checking the mail, for instance, and the government is trying to make that into – Well, most doctors are interested, even if he were a doctor, most doctors are interested in where the money is coming from to pay for their services. And so even if they have an office manager, they will at least know that there's a file somewhere that contains that information. Well, I don't know that this was even a factor in this case. Okay, well, if it's not in the record, it's not. Was he – he was performing the tests? He was performing – well, he was doing some basic tests. Wasn't there evidence that these tests were really not even done? I don't think – no, I think that these tests were all being – I think – well, obviously, there were these tests on the patients, you know, in other regions that were not done, but the tests that – there were tests that were done at the clinic, and he was fully involved in those. A lot of them were not done, is that right? Right, but he had – that's what I'm saying is there's no – there's absolutely nothing that connects him to that. You have some people in California who are behind the scenes just billing – And there's nothing at the clinic – nothing, including in the files. I can't emphasize enough, there's nothing in the files that – you know, I think that if the files had stayed there, Mr. Juarez would have been in better shape because it would have shown that he – again, he was clueless about what was going on in California. Okay, thank you, Mr. Yates. Thank you, Judge. Okay, Mr. Valentini. Good morning. May it please the Court, Francesco Valentini for the United States. I would like to begin today with defendant's sufficiency claims. Dr. Barson, in particular, claims that there was insufficient evidence to support the jury finding that he had knowledge of the conspiracy on lawful purpose. In fact, the jury heard extensive evidence, both direct and circumstantial, in support of that finding. Dr. Barson learned about the clinic that would become, eventually, the Barson Clinic from a posting on Craigslist, an open Internet site that posts job opportunities. That ad offers $7,000 for essentially no work. It was $7,000 for two half days of reviewing charts that someone else was putting together. Based on that ad and an initial phone conversation, Dr. Barson went to travel to Houston to meet with Edgar Sheckbazian. At that first in-person meeting, within most hours of that first meeting, he executed a Medicare application and immediately turned over control over the Medicare number that he would receive pursuant to that application to Edgar Sheckbazian, someone he had never met before. In that application, he also certified that he would not file false claims and that no other employee would have managing control over his Medicare number, even though he had just turned over control over the Medicare information to Edgar Sheckbazian. Right after executing this Medicare application, Barson and Sheckbazian go to a local Wells Fargo branch. There they open an account in Dr. Barson's name only. He's the sole owner of that account, again, based on all of his personal information, so that bank account could be used to collect the Medicare payments that will be received in connection with the clinic. With respect to that account as well, Dr. Dennis Barson made sure that he would have no future ability to see the statements. He directed the statements to the clinic, not to his home, a clinic where it would only be occasionally and where, to the extent that it was there at all, there's no indication that he ever asked and, in fact, he denied ever seeing any of these statements. Now, had he seen any of these statements? Had he made any effort? Had he not buried his hand in the sand? The statements would have just shown reimbursements for Medicare, wouldn't they? The amount of money. I mean, that wouldn't have shown Barson that these so-called nether regions tests were being faked, right? That's correct. They would have, however, shown levels of Medicare reimbursements, which are unheard of and simply implausible. How do we know that? How did the jury know that these levels are implausible? Because, you know, the man on the street knows that, A, Medicare is ridden with fraud, and, B, the doctors charge too much. I mean, that's not necessarily my view, but those are commonly held views. So how did the jury know these were extraordinary amounts that should have put Barson on notice? The jury was entitled to bring its common sense into the jury room, and this is the type of factual finding that we typically defer to the jury to make. In addition to that, another piece of correspondence that Barson ensured would be sent to the clinic were the Medicare remittances. Now, those remittances contained detailed information about each procedure that was billed to Medicare and performed and paid. So he would have had the direct ability. Well, he didn't certify to Medicare that he was going to review each of the remittances, did he? No, he did not certify. No doctor would do that. No, he did not certify that. He did certify that he would not send claims to Medicare with deliberate ignorance as to their falsity. He also certified to Medicare that no other employee would have managing control over his account. Well, it's not clear what that means, though, because almost every doctor's office has a manager, because the law is too complicated now, so they all have to have business managers. That's correct, and the law is complicated. But that is precisely why the Medicare application requires disclosure of that individual so there can be some control and some oversight as to who actually has access and who could be involved in the billing. This entire application was put together so as to avoid any tracing of that information and to ensure plausible deniability in the future just by claiming that he never saw a remittance. In addition to that, the evidence of fraud kept stacking once the clinic became operational. Dr. Barson went at the clinic, to the extent that he went there at all, most, I believe, four times while the clinic was operational and only on Saturdays. That, too, could be reasonably interpreted by the jury as a way to avoid confirming the obvious truth that the clinic was a front for Medicare fraudulent billing. In addition to that... Why? Because the jury could reasonably believe that he had the opportunity to go on other... Well, a radiologist hardly ever sees the patients, for instance. That's correct, but his services went well beyond reading radiology reports. He was the only physician at the clinic, and he was responsible for a wide array of medical services that were performed. It is true that there are some specialties where the doctor may not need to see the patient directly, but here he was responsible for everything from... He was the only doctor on staff at the clinic. Well, that may violate state laws, but that doesn't... It's not clear to me as such that a doctor, although it would seem weird, but it's not totally clear to me that a doctor cannot be hired simply to read certain information. That's why I asked what proof was there of what he was reading. Was he reading the whole... He was checking the EKG and spirometry reports, right? That's correct. That's his testimony of what he was doing. And did he find any indications that patients needed further treatment based on those reports? There's, of course, no evidence in the record, because to the extent that any such evidence would have existed, it would have been the patient files, and those patient files were... Well, his memory can't be that bad, so nobody bothered to even ask him that. I believe there are... I believe he may have been asked at trial what he saw in the patient charts, but especially in the context of a witness who was highly incredible and unreliable and, in fact, was subject to a two-level enhancement for perjury in connection with his trial testimony, it was fair for the jury to disbelieve that testimony as well. In addition to these pieces of evidence relating to how the clinic was operating, after the clinic wound down, stopped seeing patients, Barson continued to engage in fraud. That fraud included paying off both Juarez and Pam DeVore, even though, especially in the case of Pam DeVore, he had never even met her in person, and yet she was one person who, by all accounts, was present at the clinic and could have very likely provided evidence of what was going on at the clinic. How did he get into the clinic on Saturdays? Did he have a key? At trial he testified he did not have a key. We didn't have any cooperating witnesses. At trial he testified that, on at least some of the occasions, Sheck Basian was there and Dario Juarez was there. In addition, by February of 2010, he received a 1099 statement that made perfectly clear that there had been payments made by Medicare to him in the amount of almost $1.2 million for 39 days of operation at the clinic. His response to that filing was not to report the fraud, was not to even ask what's going on, was to make sure he would get a payment for $9,700 to cover his taxes. That, too, the jury could have reasonably concluded that was a highly indicative of fraud and that he had been complicit in the fraud all along. Now, there's a couple of points that my opponent mentioned that I would like to briefly touch upon. First, this constructive amendment claim that they have asserted. The indictment in paragraph 7 makes crystal clear what the charge was. It was a conspiracy to commit Medicare fraud, and that's it. Now, they insist that somehow that charge was narrowed by an allegation, a factual allegation, that was in paragraph 8. Now, that allegation on its face says that it was an object of the conspiracy to build procedures that had not been performed. It did not say it was the only object. The charge that defines the object was paragraph 7. In addition to that, to the extent that at some point there may have been an attempt to recast that argument as a variance as opposed to a constructive amendment claim, the indictment also made clear that the conduct that was charged included the billing of both procedures that were never performed as well as the billing of procedures that were performed or were medically unnecessary, which would include every procedure performed at this clinic. How did you prove that they were all medically unnecessary? Because the patients were recruited based that were paid off. But what was the evidence of their being paid off? The patients that testify at trial that they— Oh, okay. I thought one of the other lawyers said that was vague. I mean, the patients— I guess who paid them and how they were paid. Right, so they were paid in cash by a patient recruiter who I understand was the same patient recruiter that dropped them off in a white van at the same time every day. I was tempted to ask if they went to vote at the same time, but that's another question. I'm sorry? Never mind. So the patient recruiter made the payments. Barson himself at trial testified that Sheckbazian had told him that all the patients would be referred to the clinic, meaning that Sheckbazian, in all likelihood, the jury could reasonably conclude based on the testimony offered at trial that Sheckbazian was at least complicit in making the payments that would secure the patient inflow. Was there some evidence that these conspirators were doing this all over the country or at least more than one location? I don't think there was any evidence in the record. I think that there's evidence by—at my fingertip, I can't recall any evidence. I believe Barson testified that Sheckbazian had told him that he had run other clinics, whether those clinics were fraudulent or not. You know, why you'd be in Glendale, California, and open a clinic on the Gulf Freeway in Houston is just sort of a weird, strange thought. It is possible there were other clinics associated with this operation. There was just no evidence that came into the record at trial before the jury that would be relevant on a sufficiency claim. Before your time runs out, I do have this question about the definition of victims. What difference in the sentencing range does the definition of victims that you advocate make? The application of that enhancement, that was a six-level enhancement. I just looked it up briefly as it was a counsel table. I believe it did have a significant impact on the guidelines range. That does not necessarily mean that it would have had an impact in the sentence that the judge would have imposed, but it would have had an impact on the guidelines range. Well— But our position is that the application of that enhancement was textually supported and— Well, let me ask you—well, I disagree with that. But he was already subject to an enhancement based on the amount of loss to Medicare, right? That's correct. So aren't you double-counting it when you're saying he's lost? Medicare has been defrauded out of whatever it was, over $1 million, and then you say the same victims were, quote, defrauded at the same time. I just have two responses. First, this is an argument that neither appellant is raised in this case. The second—and for that reason it's been forfeited and is not properly before the court. In addition to that, the two enhancements work in parallel and they get at different concerns. The amount of loss goes exclusively to the amount of—or primarily to the amount of loss to Medicare, to whoever is monetarily impacted by the application, by the fraud. The victim—the number of victim enhancement has a different goal, especially in the application of this means of identification, this enhancement in cases involving identity fraud. The goal, which was mandated by Congress, was in part to make sure that there would be no market for this type of fraudulent identification. And for that reason, they serve different purposes. A large— Well, let me—I understand that, but let me just—I don't want to waste all your time, but just let me show you my theory about this. This is all in Section 2B1.1 of the guidelines. Specific offense characteristics, B1. If the loss exceeded 6,500, increase the offense as follows. And then it has all this amount, right? Right. Okay. Then in the definitions or its application note 1, definition of victim means any person who sustained any part of the actual loss determined under subsection B1, which, again, keys back to the money, which was stolen from Medicare, not from the victims. Correct. Correct. And in application 4E, the guideline provides means of identification—I'm sorry. Application note 4E, the guidelines provide that— I know what it provides. It has to do with identity theft, lawful or unlawful. But my point is I think you're using an Orwellian, topsy-turvy definition of victim. That's all. So go on with the rest. That's my personal view. I can't speak. I believe that's a textual application of the guidelines. In particular, it points to a potential argument that neither defendant has raised in this case, and for that reason the court should uphold the application of the 6th level enhancement in this case. Another point I wanted to touch upon is this notion that the government somehow committed prosecutorial misconduct in connection with its files that disappear. Our position at trial and our position on appeal has been consistent. Our position is that the circumstances surrounding the disappearance of the files point strongly in the direction of fraud and strongly suggest that—I'm sorry, of a staged burglary in furtherance of the conspiracy. In addition to that, at trial, the government introduced evidence connecting separately Dario Juarez and Dennis Barson to the disappearance of the files. With respect to Dario Juarez, the government introduced the multitude of false statements that Dario Juarez made to the FBI agent who interviewed him about the disappearance of the files. With respect to Barson, the government introduced different evidence. Barson offered this theory whereby he was about to go to Houston to pick up a copy of these files when he received a call by Dario Juarez informing him that he had just reported to the police the disappearance of the files. But in fact, he also admitted that he received a copy of the police report. That police report does not mention the files, and in fact, Dario Juarez went back and filed a separate police report to note the disappearance of the files. The first police report just said a burglary had occurred. From that divergence in versions, the jury could reasonably believe that it was a public story, one that, at least at that point, Agent O'Leary of the Houston Police Department received from Dario Juarez on August 25, 2009, and then there was a private version of the events. For those who were in the know, that is certainly Dario Juarez and certainly Dennis Barson. That is a completely legitimate inference that the government argued in closing argument, and for that reason there is no merit to any allegation of misconduct in this case. Let me ask you this. Did Juarez actually conduct any of these tests or pretend to conduct any of them? I'm sorry, could you repeat the question? Did Juarez conduct any of these tests or pretend to conduct any of them? According to the testimony after a trial, the EKGs and the spirometries were performed by a medical assistant, Amber Wheeler, who testified at a trial. The government called it a trial. After that, as part of the patient workflow within the clinic, the patients who see Dario Juarez in a room, he would see every patient behind closed doors. It's unclear what exactly Dario Juarez did with those patients, but it is clear that he had no license or credential to do anything related to medical practice to those patients. He didn't testify, did he? Dario Juarez did not testify. Who sent the information to California or wherever the billing was to take place? Somebody had to give them the names of the patients and so forth. Who did that? That's correct. The evidence at trial, because there was no cooperating witness, there is no clear answer to who materially transferred the information. We know that Edgar Shagbazian was the leader of the clinic on the ground. We also know that another individual who appeared to be close with or close acquaintances with Edgar Shagbazian, by the name of George, whose last name is not known, was also involved in the process. There was strong evidence for the jury to conclude that whoever did the billing received that information. Well, you know who did the billing. It was a guy in California, right? That's what they said. They gave another Armenian sort of name of a fellow in California who actually sent the bills to Medicare. So there is no direct evidence as to who actually sent the bills to Medicare. What they did is they offered documentary evidence with the personal information of the patients that were seen in Houston that were recovered at Generica Bramion's, I believe you're referring to, in California. And from that, the jury certainly believed that and concluded that Generica Bramion conducted the actual billing. If Your Honor has no further questions, I will submit. Okay. Thank you very much. Okay. Mr. Yannis, back to you. Sorry about that. I wasn't sure. I just wanted to respond to the government's mention that Mr. Juarez wasn't licensed. And, you know, that's kind of the big thing hanging over this case. But it just doesn't get us to that gulf of saying because he wasn't licensed, he knew about the fraudulent billing operation. What about the missing, the stolen records and the evidence about that? The stolen files? Yeah. As I mentioned earlier, the files were exculpatory, if anything, to Mr. Juarez. And I think it just underscores that he did something that looks suspicious, but it doesn't get – if there was something in the files that he knew of that say that there was an indication that there was fraudulent billing and he had helped, then yeah, that might get us over the hump. But it's just the opposite. The files contained, based on the record, only information that contained only the tests there. And so we just – it's still a huge gulf to get to that point. How do we know what the records show? Pardon me? How do we know what the records show? Because several people testified that the information – like Amber Wheeler would get the files at the end of the day, and they only included the testing that was actually done. And so – and I think one or two other people – I know Dr. Barson had testified in a non-self-serving way, and I mentioned – I discussed that in the brief. But it's established in the record that there's nothing – based on the witness's testimony, there's nothing that is inculpatory in those files. Can I make one more point? I noticed my – I just want to say that it seems kind of absurd to suggest that this man, John, who wasn't even handed with either of these people what his name was, who hired both these people out of Craigslist, that it's okay to infer that he would tell these other people that, by the way, we have a fraudulent billing operation 1,500 miles away in California. It just – the guy was keeping his own name from them, and there's just – there's nothing that gives us the ability to make the inference that he was letting them in on this other operation. Thank you, Judge. Thank you very much.